appeals. We have three cases to be submitted today on oral argument, beginning with United States v. Jefferson. Mr. Washington. Yes, Your Honor. Good morning. Good morning, and may it please the Court. My name is James Ward Washington III, and I represent Palmer Jefferson in his appeal on certain matters associated with his conviction in the Eastern District Court error in ruling that he was not entitled to a hearing, and by ultimately rejecting his motion to suppress. Mr. Jefferson also believes that the District Court erred in overruling his objections to his pre-sentence investigation report. As a brief summary, Mr. Jefferson was convicted of multiple drug-related charges, including possession with the intent to distribute marijuana, cocaine, methamphetamine, and heroin. He was also convicted of being a felon in possession of a firearm. Mr. Jefferson was acquitted of the charge of carrying a firearm in furtherance of a drug trafficking activity. As it specifically relates to this appeal, Mr. Jefferson asserts that on April 30, 2019, he was wrongfully detained and arrested while officers conducted an illegal search of his residence. Mr. Jefferson attempted to have a hearing to challenge the omission of the evidence gained on that day, but he was denied the opportunity to do so by the District Court. Mr. Jefferson also asserts that after his trial, the District Court admonishingly applied several provisions of the federal sentencing guidelines to his case, and accordingly, his guidelines are much higher than they should be. As it relates specifically to Mr. Jefferson's motion to suppress, Mr. Jefferson made a substantial preliminary showing that the information that he submitted to the District Court, specifically, Mr. Jefferson submitted information relating to photographs and timestamps on those photographs that were taken during the search of his residence. Those photographs and timestamps on them reflect that the search began well before the search warrant application was applied. I have a couple questions about that. The District Court seemed to credit the daylight savings time argument that the time that the camera was not set for the correct central standard time. Is that a factual finding to which we have to defer? Well, I'll have two responses to that. First, I think there was inconsistencies with that. So, the District Court decided as to respond to it. So, when you look at the initial briefings on that issue, the government came in and stated that they had to physically go in and that they physically go in and change the camera's clock during that period every year. What the District Court found is that that didn't need to happen because the clock did it automatically on its own. So, Mr. Jefferson's position is that's an inconsistency, and either the government made that argument up or the clock on its own changes the clock. So, I don't know if that's a factual finding. She looked at the time stamps and stated that it says central standard time versus daylight savings time, but that's not what the government argued. The government argued that the officers just simply forgot to go in and physically change the clock as was standard for their proceedings. And you don't believe the District Court accepted that? I don't believe the District Court accepted what the government stated or what we stated that it was a correct time. What did the District Court base its ruling on then on that point? By looking at the actual photographs and making its statements, making this ruling based off the photographs themselves. They rejected the government's argument and they rejected Mr. Jefferson's argument as well. What about the statements that your client made, allegedly made, to the officers that he had cocaine and a gun in the apartment? Wouldn't that be a reason to be able to go into the apartment at that time or not? So, first, Mr. Jefferson denies that he made those statements. And secondly, we argue that if those statements were made, they were made after a de facto arrest happened. After a de facto arrest? Is that what you said? Yes. If you look at the timeline of the events, even according to the government, Mr. Jefferson was encountered in the parking lot by his residence at 715 A&M. And the reports, the narrative of the police reports and the arrest report and the search warrant reports, they all have conflicting information as to what happened after that time. At some point in time, Mr. Jefferson was handcuffed and transported back to his apartment. And he sat there either for an hour or two hours, depending on whose version of the time stamps you believe, before a search warrant was actually applied for. We consider that a de facto arrest. So, if you look at the first sexist case in Acosta, they speak about similar circumstances. They talk about an individual being encountered, being prevented from moving on his own, being handcuffed and being transported to some location away from where he was originally accounted and saying that that is a de facto arrest. And if he's not told that he's being arrested, even if he's raised his Miranda rights, then any statements that he's made can be suppressed because they were subject to an unlawful arrest. And we believe that that's what happened in Mr. Jefferson's circumstances. And as it relates, going back to the photographs, we believe that the timeline that Mr. Jefferson has stated, and that was testified to by his girlfriend who was present in the apartment at the time of the search warrant, who stated that, yes, they started searching the apartment before they applied for the search warrant. The timeline of the stamps, as Mr. Jefferson explains them, supports what happened that day. He was encountered at 7.15 a.m. He was transported. The photographs start in his apartment at 8.18 a.m. This is according to the timestamps. If you read them on their faces, they are 8.18 a.m. That's an hour. He was right there in the parking lot of his apartment. The photographs started at 8.18. The photographs continue in rapid succession until 8.46 a.m. At 8.46 a.m., the photographs stopped. Five minutes later, the government admittedly applied for a search warrant at 8.51 a.m. The search warrant is issued at 9.07 a.m. At 9.07 a.m., the photographs begin again. That completely coincides with Mr. Jefferson's version of the events. So if that happens, if the photographs actually started at 8.18 a.m., these officers were in his apartment, searching the apartment, and doing so well prior to stopping and applying for a search warrant. Mr. Jefferson has also pointed out numerous inconsistent statements that the officers made in their reports and affidavits from the date of the search warrant, specifically in a probable cause affidavit for the arrest. The government states that Mr. Jefferson was arrested shortly after he made the statement that you referred to earlier, shortly after he supposedly made a statement that there were drugs upstairs in his apartment. They stated that the arrest happened at that time. The probable cause affidavit states that the arrest happened at 9.10 a.m., just minutes after the search warrant was issued. The probable cause affidavit states that Mr. Jefferson was arrested not because of the statements that he made, but because of the laundry list of items they stated that they found would have had to have been in a three-minute search at that time. Does it matter whether or not these items would have been inevitably discovered? Well, I think what matters is, and we have to look at why we're here today, because the district court denied Mr. Jefferson's request for a hearing. All he has to do is make a substantial assurance he can get more evidence to challenge the officer's version of the events. So, what does matter is if they omit material information in applying for the search warrant, which we suggest that they did, or if they omit material information, I believe the Fifth Circuit has previously stated that the omission in United States v. Massey, the omission of unlawful events prior to a search or tantamount to basically hiding unlawful events from the magistrate and therefore presenting the magistrate with falsities. So, at that point, you have the officers presenting false information to the magistrate judge. So, by presenting that information to the magistrate judge and getting a search warrant based off of false information, I believe anything that they would have found after that point would be fruitful and poisonous for you and would not be admissible and would be had they provided the information, had they not gone into the apartment beforehand, maybe this would be a different situation, but that's not what happened. And they always plan to go to an apartment. We had testimony at trial that they showed up the day before and basically lied to the apartment manager and said that they had a search warrant in hand and asked for a key of Mr. Jefferson's apartment. The apartment manager said that she gave them that key. Then they showed up the next day. Well, they showed up later at night to do some bailings. They always planned on going into Mr. Jefferson's location. And if you look at the facts, if Mr. Jefferson was willingly telling these officers that he had drugs in his apartment, why didn't they just ask for his consent to search? It's not what happened that day. The photographs and the time stamps on the photographs support Mr. Jefferson's versions of the events. Other inconsistent statements relate to the surveillance that the officers had. If you look at the police report, they stated that they got information from an anonymous tipster who provided information that a PJ was selling drugs at one location in Metairie and another location in New Orleans. They say they followed that individual in New Orleans. He was driving a salara. They came back later and said, no, it was a pickup truck. Small inconsistent statements that they presented to the court and to through briefings that don't add up. Another inconsistent statement. On the photographs in the metadata, it states that Detective John Weibelt was the photographer during the search warrant. The government in its initial briefings supported that information and stayed at the same. However, when it was brought to their attention that Detective Weibelt was not present during the warrant, they changed the story. The testimony was then that Detective Weibelt was never taking pictures at the warrant, that his name was on the photograph metadata because he was the custodian of the camera and it doesn't change throughout the system. Are you claiming that the inconsistencies were deliberate or that any inaccurate statements were deliberate as opposed to being just mistakes? Your Honor, what I'm claiming is that, and I believe the Fifth Circuit's jurisprudence would back me on this, that I don't believe that we have to show that it was reckless or deliberate. I think if it's a material . . . No, but that wasn't my question. My question was, do you say that they were deliberate? I believe that the omissions were so deliberate, I mean, that they were so material that they rise to the level of being deliberate. Do you want to talk about the calculation of the quantities of the methamphetamine? Absolutely, Your Honor. I think that's one of the major issues in Mr. Jefferson's case. So, the district court allowed the evidence to come in based off of the quantities of methamphetamine involved in this matter, based off of what the court believed or deemed to be relevant and reliable information gained during the trial on this matter. We disagree. There were 8,886 pills that Mr. Jefferson was charged with. Of those pills, only 131 pills were tested and weighed. The government and the district court took a position that that percentage was enough to pull out an average weight of the pills to determine the amount of weight that Mr. Jefferson should be charged with. We disagree. If you do the math on the 131 pills that were tested, compared to the 8,886 pills that he was charged with, it's less than 2%. It's 1.4% of the actual quantities that he was charged with. The government has presented cases stating that you don't have to test all of it. You can do a sample, a small sample, but the cases that they cited relate to samples of 15% or more. We don't have a case where the court relied on less than 2% of the actual drugs to determine the quantity. In such a situation, we believe that the average drug weight should apply here, based off the conversion drug weight tables found in Section 2D of the United States Census Guidelines. How does that affect this case? That affects the case because if you take the methamphetamine conversion drug weight, it's 5 milligrams per pill. At 8,886 pills, that would drop it down to 44.43 grams. If you do the CDW conversion, that brings it up to 2 kilograms, most probably 2 kilograms, I'm sorry, and that brings it up to 88.86 kilograms. How does that affect the sentence? That would drop his sentence guidelines by at least 8 to 10 levels. That depends on whether your honors agree with our position that the other 36 pills were for personal use, which they say is a moot point, but I think that comes into effect by that. It would drop it 8 to 10 levels because he was charged with, under the CDW guidelines for methamphetamine, he was charged with 3,857 kilograms of methamphetamine. This would drop it down to 88.86 kilograms. That would substantially reduce his guidelines, but it would drop it from a level Yes, you have saved time for rebuttal. Thank you, Mr. Washington. Thank you. Mr. Terrell. Good morning. May it please the Court. Stuart Terrell, Mappin Government. Wanted to address some of the timeline issues. There was reasonable suspicion for the initial stop, Mr. Jefferson, in the parking lot, and a lot of it dealt with what happened the day before facts that came in, mainly from an anonymous tip given to the Jefferson Parish detective. They received an anonymous tip about drug trafficking happening on the Riverside apartments. The detective was familiar with these apartments. It was a high-crime area. There was actually recently an officer-involved shooting around that time. They began to work to corroborate this tip regarding that the drugs being trafficked in from Baton Rouge to New Orleans. When they did not see the vehicle mentioned coming in from Baton Rouge, the detective, through more corroboration, asked for the number of the anonymous tip, called that number back, spoke with the anonymous source who pointed out the address that was suspected to be where the stash house was for these narcotics. Getting that address, the police still went to work towards corroborating that anonymous tip and find that that address was registered to a Jefferson Palmer Jr. That matched up with the anonymous tip saying that this person is J.P. J.P. matching up with Jefferson Palmer Jr. The police then set up surveillance on this address, surveillance overnight to see if there's more corroboration. Going towards the key, speaking with the apartment manager, they were going towards all possible what could happen the next day, but they still were corroborating the source with surveillance to see if this were Jefferson Palmer, who is J.P. in this address. Did they have the key that they had gotten under false pretenses from the landlord? I want to categorize this false pretenses wrong, but they did have the key, but they did not use the key. No, they had got it under false pretenses. I didn't, law enforcement sometimes will use false pretenses, but. They had the key the day before, that's correct. Because they told, is that true, that they told the landlord that they had a warrant and they didn't actually at that time have a warrant? They did not at that time have a warrant. Did they tell the landlord that they had a warrant and they didn't? It's just. I think, well, their semantics would be that. It's not semantics. They either lied to the landlord or not. It probably neither here nor there, but is why were you resisting answering that? Do we not know the answer to the question? I would say not. No, I know they were trying to, for all. So you don't know whether they told the landlord that they had a warrant. That's when it came out from the landlord was that she believed that there was a warrant and she went back and she gave them a key. So she did provide them a key. And there was no warrant at that time. At that time there was no warrant. That's correct, Your Honor. But I think more importantly is that they did not use that key. They used the key from Mr. Jefferson after the Terry stop in the parking lot. I think importantly is that they wait until they see Mr. Jefferson Palmer Jr. exit that apartment that morning and lock the apartment. They now see reasonable suspicion that he is exiting that apartment. Right, reasonable suspicion to ask him questions and that sort of thing. But that it became an arrest when he's blocked in, though. I would say it's still a Terry stop, Your Honor. The case law in this circuit is even putting somebody in handcuffs does not amount to it. Well, it can under we have to do a multi-factor test. And if you block somebody in, that is sometimes that that is a big factor that they're not free to leave. And he was he blocked in at that time. So that's when the arrest occurred. He was approached in the parking lot before he entered the vehicle. Could he get into the vehicle? Not when he was stopped and they approached him to speak with him about. Because they're the vehicle can't leave the parking lot the way he is, right? Well, once they're speaking to him, he can't get into the vehicle. That's correct, Your Honor. Okay. But they are speaking with him on the reasonable suspicion. And I think importantly, the first thing, most random Mr. Jefferson lies and said it has nothing to do with that apartment. He's not leave. It's not until he's confronted and told that they just saw him leave the apartment that he then corrects and says, I have cocaine and a firearm in the apartment. So I think the initial false Mr. Jefferson only increases the reason suspicion and that he is lying immediately and saying that he did not just come from the apartment. They just viewed him leaving that morning. If this were, in fact, an arrest at that point, does the government believe there is a justification for an arrest rather than just a Terry stop it at the point where he is locked in and they're questioning him? I believe at this point it was reasonable suspicion to stop him based on the cooperation from the anonymous tip the day before and what they had just viewed that morning. That's not the question. I'm sorry. Does the government believe that there is a legal justification for arrest at that time? Assuming that it was an arrest rather than just a Terry stop, is there a legitimate justification for that that the government is advancing? I understand your hypothetical post is state incriminating statements. No. When they approach him and they block him in such in the test is whether a reasonable person would be free to leave. And if the court were to determine hypothetically that he was not free to reasonable person would not believe they were free to leave. It would there and therefore he was under arrest. At that point, was there a justification for the arrest at that point? There would be justification to arrest him based on everything they've seen. But at that point, it was reasonable suspicion. But I'm trying to understand the question. I apologize. I don't understand why the question is assuming that it's not just a Terry stop because he can't leave and he's under control. Is there a legitimate reason for the government to arrest him at that point before based upon the tipster alone? No, not prior to the statements. So if we were to determine hypothetically that it was an arrest, at that point, what what happens? There's you saying there's no basis for the arrest at that point. Well, I guess our pain is that it wasn't an arrest and suspicion. But do you fight in the hypo? I guess I'm trying to understand the hypo. The hypo is if he's arrested right then, is it legal? And what if it's not a legal arrest? Does it matter for this case? Well, right, cut off right there in their pre statements, Your Honor. Yes, there'd be nothing else to go forward. So then what happens in this? What's the result? I guess it's in from remand to the district court. If that's the finding that we would find that the case law shows it as a reason sufficient stop. Okay, thank you. But going forward towards that, he did give the post random statements and mainly also that he said that Sylvie, his girlfriend, was still in the apartment. I believe that's important as well, because that day their officers reason believe that if someone's in the apartment, there could be destruction of evidence. And that's led towards the security suite prior to the application of the warrant. And going again towards Miss Sylvie, going towards a defensive argument about the. So are you saying it was before the warrant? There was a security sweep before the application of the warrant. That's correct, Your Honor. And that these items were discovered during the security sweep and not during the execution of the warrant? No, the only thing viewed during the security sweep was Mr. Jefferson said, I have a bag of cocaine in the bathroom. During the security sweep, in plain view, the bag was open. They do see the bag of cocaine. That's the only thing that's viewed during a security sweep. It's not till after the application of the warrant that the other items are found because they're in air vents and things of that nature. There's no rummaging through drawers or anything of that nature. There was a security sweep given that Mr. Jefferson has stated another adult was in the apartment. Mr. Jefferson had lied before. So if he lied about not even coming from that apartment, I think the officers have a good reason to do a security sweep to see who's in the apartment, if anyone else besides Miss Sylvie is in the apartment. During that security sweep, the bag of cocaine in the bathroom was exactly where Mr. Jefferson said it would be. So that's your position on inevitable discovery, anyway, that the cocaine would have been there with the security sweep, regardless of any justification for entry? Correct. The inevitable discovery, given that Mr. Jefferson said it would be there and also plain view in the bathroom, the bag open, it was where Mr. Jefferson said it was. That bag of cocaine would be an inevitable discovery. But then he did, after that security sweep, secure the room and secure Miss Sylvie, who was in there, file for the warrant. Now, going towards... How does the timing work on the warrant? Yes, Your Honor. Because either it took a long, long time for them to stand out there with him, if it's under your view of it, or else it wasn't and it was post or not enough time. It's one or the other. Going towards the time stamp, Your Honor? The time of when they did all the inventory. Either it was a long, long time that they're waiting, or else it was a almost impossibly short time. So which one was it? It was a shorter amount of time, Your Honor. They do detain individuals in the apartment and apply for the warrant at that time, and they're waiting for the warrant to be approved to then go with the actual search. That goes towards the time stamps, which the courts did address, and that's on record. On 690, there's a photo that shows the clock is calibrated to Central Standard Time, but the digital import is Central Daylight Time. And that, on its face, addresses the hour difference the defense is arguing, is that the clock was calibrated to one time zone or one area. But on 690, which is a photo that the defense attached to their most distressed, it time stamp of Central Standard Time on the clock calibration, the digital import was Central Daylight Time, and that is the hour difference. So the warrant was issued minutes before the photos were taken, so that probably explains the hour difference, and the court, the official court correctly addressed that in her order and reasons, given that, based on what was presented to her, specifically on record 690, that the calibration of the clock was Central Standard Time, but the import was Central Daylight Time. That goes more towards the basis for a Franks hearing to put forward a substantial showing, and just these photographs of these time stamps, which the court was able to show, show Central Standard versus Central Daylight Time, is not a substantial enough showing to warrant a Franks hearing. There could have been an affidavit from Ms. Silbey who was in the apartment presented that was not presented. I would contest that because Ms. Silbey testified for the government at trial, but there was no other affidavits presented to the district court to warrant a Franks hearing. There was no affidavit from Mr. Jefferson to rebut or counter the, what he says is a false claim that he did not make the post-branded statements. That was not presented. The only thing presented to district court trying to get a Franks hearing were these time stamps. District court looked at them, noticed the Central Standard Time, Central Daylight Time discrepancy, and said that was, that on its face is not enough to warrant a Franks hearing, and that was a proper ruling by the district court. So is it your position that the arrest took place before any pictures were taken under the government's timeline? Mr. Jefferson was arrested before the photographs came in because that would be after the warrant, Your Honor. That's correct. So before the warrant, he was arrested. That's correct, Your Honor. At this time, they did the security sweep, the inevitable discovery in plain view, bag of cocaine where he said it would be. His post-branded statements and what they found inevitably in plain view would be the grounds for arrest, but his post-branded statements. Okay, well the time of the arrest is listed as 9-10, which is the same time as the search warrant execution on the form. That could just be how the officer wrote it in the report, but he was post-branded statements and what they found in the apartment led to justification for the arrest, but the initial stop in the parking lot was real suspicion based on the anonymous tip and what they collaborated. So the 9-07 search warrant time is not really relevant to the arrest time? No, Your Honor. I think it just is what was written in the report. It might have been a couple minutes off, but it's not reckless disregard for the truth or there was nothing recklessly omitted or nothing falsely put into the warrant. What was put into the warrant was... Counsel, did the government rely on the independent source doctrine? Or what was the bag that was found in the apartment in the bathroom? You're familiar with the independent source doctrine, I'm sure. Yes, Your Honor. But the district court, I thought, relied upon that. District court, in her order of reason, did address the independent source doctrine and said that would have applied as well in her order of reason. That's correct, Your Honor. Now, going more towards the sentencing guidelines, Your Honor. First, Mr. Jefferson was convicted on account six of possessing a firearm, and then acquitted conduct is still applicable here. So the two-point enhancement was proper, given that there was a conviction for possession of the firearm, and the district court did properly use the two-point enhancement. Facts that came out of trial to show the possession of the firearm for the two-point enhancement. And going towards... Was it a particularly potent meth? It was a mixture. He was charged with a mixture in substance of methamphetamine, Your Honor. And I think that goes towards the extrapolation... That's what I'm asking. Why is it so much more than the average? The methamphetamine? Mm-hmm. The amount that he possessed? The amount that he's being... You heard the argument that it was eight to 10 levels different. Why is it so much stronger than the average that's normally used? And it just goes towards the drug rate, Your Honor, which is the moderance of the evidence. Yes. Extrapolation is allowed. There was, I think it's important to point out, they didn't just... Going towards percentages, there's no case law saying exactly what percentage, but they did test a pill from each bag that was seized. So every bag that was seized does have a sample that was tested. It might have just been one pill from each bag. They did test every bag that was seized. I think that's an important fact to point out, that they didn't just test one sample and then extrapolate to everything that was seized. For the bags that were seized, they tested one pill each, and it came back with methamphetamine. They extrapolated it. There's been case law where they do extrapolations when there's no drugs found. But the percentage... For percentage points, they did test a pill per bag, and that goes towards the drug weight, and the drug weight did affect his sentencing given how much he did possess. And I believe that was correct, because it's preponderance of the evidence. You have a case that says that 1% is enough. Well, I don't think there's a case law that touches on any types of percentages, Your Honor. There's no case law that comes out that says what percentage you have to meet. It's just preponderance of the evidence to show with extrapolation what was possessed. But this was some... The drug weight is very high. And I would counter that. They tested a pill from each bag. Yeah, I'm just saying it is. You agree it's high. It may be what it is, but it's high. It is high. Compared to most. I agree, but they properly tested it. There's no case law showing a threshold of what percentage needs to be tested. They tested a pill from each bag and properly extrapolated that weight from what they tested, Your Honor. So I can't cite a case to you, because there's no case setting that... I thought you were going to tell me something about this drug manufacturing process and how this is particularly... They were known for doing strong drugs, and that's in the record or something. But that's okay. Thank you. Your Honor, that was brought up by district court on the sentencing from the objections from defense. I believe the district court properly addressed that when handing out the sentence, as well as properly address in her order and reasons why this was a reasonable suspicion of Terry Stopp, why the warrant was proper, mainly that there was nothing in the warrant about the search in the apartment. So there's no reckless disregard for the truth or anything improper in the warrant. They put the facts leading up with the anonymous source that they properly, under jail in Florida, corroborated. It was recent. It was accurate. They did their due diligence in corroborating that anonymous source's information. They see Mr. Jefferson Palmer Jr. leave that apartment that morning, lock the door, and they make the decision to do a reasonable suspicion of Terry Stopp in the parking lot. When they conduct the stop and immediately question him post-branded, his first thing that he does is lie and say he did not just leave that apartment. He then, when confronted that they just saw him leave the apartment, corrects and says, I have cocaine and a firearm in the apartment. My girlfriend's in the apartment. Under a fear of destruction of evidence, they do a security sweep. In plain view, they see the bag of cocaine, inevitable discovery, and they then write the search warrant. And after the search warrant, the remaining drugs and contraband are found. For all the reasons stated, Your Honor, District Court properly addressed all the defendants' arguments in a written order. She took proper analysis of the franks. There is nothing substantially presented by the defense warrant of Frank's hearing beyond time stamps, which the District Court pointed out was essential standard time and essential daylight time discrepancy. And she also properly addressed the sentencing objections. There being no order from the District Court, I respectfully ask the Court to pass. All right. Thank you, Mr. Terrell. Thank you. Mr. Washington, you saved some time for rebuttal. Thank you, Your Honor. I'd like to briefly hit on a couple items. The government stating that at least one pill was tested per bag. I want to break that down for a second. There were three bags that were found on the search warrant. The first bag contained 1,350 pills. The government tested 129 of those pills. The second bag contained 7,500 pills. They tested one pill. That's less than a half a percent that they tested out of that bag. You cannot rely on the weight of that one pill in that bag of 7,500 pills to determine the average weight. You have to go to the guidelines in that case. The third bag contained 3,060 of those pills. That's a huge amount of pills. While there is no specific guidance as far as how many or what percentage you're supposed to test, the cases that are cited, they're saying that the one pill per bag was enough. The quantities are a lot less. You're talking about 51 percent of the cases that the government cited. I did the math. It's about 51 percent. You do not have the cases where less than 2 percent were cited. I'm not saying that there should be a hardline rule, but I'm saying such a minimal amount that's tested. That's what the guidelines are for. The guidelines say that if you cannot get a reasonable estimate based off the testimony at trial, you have to use the sentencing guideline tables to make that determination. I would say you hit on one point that came up at trial. At trial, Mr. Jefferson was precluded in the motion from the judge from asking anything about the timing of the search warrant, but an issue came up as far as how Mr. Jefferson and his daughter sat there before the agents and the officers applied for the search warrant. As it stated, and everybody admits, he was encountered at 7.15 a.m. From 7.15 a.m. to 8.51 a.m., there's no doubt, and the testimony is clear, that he was almost immediately handcuffed and transported back to his apartment because the officers stated that they did not want to make a scene. So he's back upstairs within five minutes. What were they doing for that additional hour? What were they doing from 7.20, 7.25 to 8.51? They would have the court and everyone else believe that nothing was going on during this time. You have a picture of Mr. Jefferson sitting in his living room with his daughter sitting on his lap. They didn't let him take his daughter to school. He was under arrest. They didn't tell him he was under arrest, and in probable cause affidavit, they say that he wasn't arrested until 9.10. But here he is sitting in his living room with his daughter. It depends on whose timestamp you want to believe. The search warrant was applied for at 8.51. Everyone agrees to that. That picture was taken at 8.24, according to the timestamp. The government is saying that that was 9.24. So now you have two hours where he's sitting there waiting for them to apply for a search warrant with his daughter sitting in his lap crying. Why didn't the girlfriend take him to take her to school? I'm sorry, Your Honor? Why didn't the girlfriend take her to school? They transported the girlfriend. So when the girlfriend was in the apartment, they went in and they asked a question. She said she testified that they started searching the apartment immediately. They let her get dressed, and they transferred her down to the station. She goes 18 miles away from this apartment, and she's getting interrogated at 9.10 a.m. Her interrogation starts at 9.10 a.m., and the video shows that. So she's gone. She said before she left, they were already searching the apartment. That was her testimony. The landlord said the day before that they showed her a piece of paper. They said we have a search warrant for Mr. Jefferson's apartment. We want the key to the apartment. She gave it to him. That was her testimony at trial. Your Honor, I'm not saying that any one of these things, excuse me, creates a situation where a Frank serum should have been granted. But the totality of all the circumstances, if you look at the timeline, if you look at the office of action, you look at would a reasonable man believe that he's sitting there arrested? Would he make statements? Yes, he would believe that he's arrested. And Your Honor, Judge Higginbottom, to your question, whether or not the independent source doctrine applies here, it was a de facto arrest. So would the court say that he made statements that would have allowed them to do the search anyway? But if it's a de facto arrest, those statements come out anyway. So you have there, again, if those statements are not included in the search warrant, then you can't have the search warrant. There was no probable cause before the search warrant started. And if there were, they would have put that in their probable cause affidavit. They didn't address a statement in the probable cause affidavit for the arrest. They said that he was arrested based off the items that were found in the search warrant. All of these things add up to the fact that Mr. Jefferson should have been able to have a hearing. These statements should have been suppressed, the evidence should have been suppressed, and his quantities were calculated wrong. And for all these reasons, we ask this court to overrule the district court's opinion on these issues. Thank you, Your Honors. Thank you, Mr. Washington. Your case is under submission, and we noticed that your court appointed. We wish to thank you for your willingness to take the appointment and for your good work on behalf of your client, and particularly your detailed knowledge of the record was very helpful to the court. Thank you, Your Honors. Next case, Kim v. American Honda Motor Company.